The United States Court of Appeals for the 11th Circuit is now open to court and to the law. God save the United States in this honorable court. Please be seated. Good morning. We have three appeals to rehear on bonk this morning. Judge Grant will join the court after we hear this first appeal. The court will remain seated. The courtroom deputy is going to notify Judge Grant when it is time to come in and she'll just join us on the bench before we get started with the second argument. After we hear the second appeal, we will take about a fifteen minute break. Counsel, we're familiar with your cases. We've read your briefs, the authorities cited in your briefs, at least portions of the record, so in the limited time that you have this morning, you should feel free to get straight to the heart of your argument. You do not need to familiarize us with the background of your cases. We're familiar with them. We'll probably have some questions, but be mindful of the clock and our traffic lights. When the red light shines, it is time to wrap up. If you're answering a question from the court, you, of course, can finish your answer. That won't lose you any rebuttal time if you have rebuttal time. We will begin this morning with Pye v. Warden. Ms. Benton, will you please come and speak with us? Good morning. Good morning. May it please the Court, Jill Benton here on behalf of the petitioner Willie James Pye. The mitigating evidence here mirrors in all material respects that which the Supreme Court has held establishes Strickland prejudice in cases like Williams v. Taylor and Rompea v. Baird. If this Court still recognizes that there does, in fact, exist a rare case in which federal relief from an unconstitutional sentence of death must issue, even after considering the substantial protections that EBPA offers the state courts, then this is that rare case. Three judges of this Court properly identified each of the state court's unreasonable findings in a straightforward application of EBPA. Contrary to the suggestions in the Warden's rehearing petition, the panel's unpublished opinion was wholly unremarkable. It was consistent with the Supreme Court cases applying EBPA, and it was uniform with the other decisions of this Court. Let me ask you a question, Counsel, about some of the recent Supreme Court cases. In Hines, the Supreme Court said that a federal court must identify and rebut all of the justifications of the state post-conviction court. Does this mean, in your interpretation, all alternative reasons that the Court made, such as deficient performance and prejudice, or does it mean each and every reason and sub-reason that the Court relied on? Well, in some cases, certainly one reasonable fact-finding or one reasonable application of the law might be enough to save a state court judgment. The way that I read cases like Hines and Kyer is that these findings are like pillars supporting a platform, right, that the ultimate adjudication is, you know, here, no prejudice. And there may be some cases in which just one finding will support a no-prejudice finding, right, a case like Jones v. Warden, where you're seeing the new mitigating evidence would have opened the door to a lot more aggravating evidence. If that one finding is reasonable, that might be enough. How does the panel opinion here conform with Hines? Well, the panel opinion here takes the state court on its own terms and really methodically goes through each of the prejudice findings from the state court that support the ultimate no-prejudice conclusion and shows how patently unreasonable they are. Some of them are just, you know, like the treatment of the affidavit is just very divorced from context and then also some of the legal conclusions. For instance, the idea that there's no nexus here between the mitigation evidence and the crime when some nexus is required. Obviously, it's not required, and it also happens to be present here. The idea that Mr. Pai's age at age 28 was enough to defeat a finding of prejudice or even that it, you know, bore negatively on the prejudice that existed here. That's just completely, you can't reconcile that with clearly established precedent. And so I think the panel opinion does a really careful job. I just have a question about the affidavits. First question is why affidavits when the state court held an evidentiary hearing? Well, I think I'd like to talk about affidavits here for a little bit and first correct a misimpression I think has wormed its way into this case. The affidavit testimony somehow comes into the state court record in Georgia untested by the adversarial process. That's just not true. The Georgia statute allows for your evidence to come in by way of affidavit. It almost universally does, in my experience. The bulk of the evidence comes in through witness affidavits. And the way that works is at a discovery deadline for the petitioner, some many months or even years in advance of the evidentiary hearing, you must serve those affidavits on the State Department of Law along with the address and phone number of every affiant. And then the respondent gets their own period of discovery in which they can call up, visit, or depose each of those witnesses. And the Petitioner's Council knows that and the witnesses know that. They know that they're swearing under oath to a testimony that can then be questioned. And here the affidavits were served on Respondent's Council in November of 2006. The evidentiary hearing took place in May, I believe, of 2009. And we know that the Attorney General called up some of these witnesses. We have Mr. Lawson's affidavit where they walk Mr. Lawson, the social worker, through each step, obviously, of his testimony, where he gives this very graphic testimony describing the Pai's home, the violence, describing what these children went through and what he was up against in working with his family. They walk him, obviously, through all of that. The only concession they get from him is, I didn't actually see Mrs. Pai upend the whiskey bottle while she was pregnant. I merely understood her to be drunk from her behavior and her speech. That's the only concession they get from him. So it's not as though affidavit evidence is something that is a windfall to the Petitioner's Council and it just comes in. It is actually tested. And to your point here, there were specific key witnesses who were intended to be live at the evidentiary hearing. Mr. Lawson died a few weeks before the evidentiary hearing. Officer Ellenberg, who was one of the key corrections officers, to offer testimony about Mr. Pai's prison nonviolence. Mr. Ellenberg, if you look at the record, was scheduled to be a witness as well and ran into some health problems and couldn't make the five-hour round trip from North Georgia. And then there was a teacher who was also called to give the teacher's perspective. So there was sort of an array of the disinterested, non-biased witnesses who were going to be presented live. And then the rest comes in via the affidavits. Okay. Can I ask you a question about the nexus you mentioned? The state court did say there was little, if any, connection between Pai's impoverished background and the premeditated and horrendous crimes in this case. Why is it error for the state court to consider a lack of nexus? The state court never said that a connection is required. But why is that not relevant in its evaluation of prejudice? Well, I have two responses to that. One is it might be relevant, but it doesn't defeat the ultimate prejudice finding. And we know that. We know that from cases like Williams v. Taylor. What possible relationship between Williams' early deprivation and poverty was there to his multiple statistic attacks on elderly victims? What connection was there between Rompia's deprived early childhood and his stabbing a barkeep and setting him on fire and slashing his face with a bottle? We know from the clearly established precedent that the nexus doesn't, lack of nexus doesn't defeat a finding of prejudice, especially when the mitigation evidence is as strong as what we have here and as all-encompassing as what we have here. The other thing is there really is a nexus between some of this mitigation evidence and the crime. And the panel points out this might have contextualized some of his violence in the context of his relationship with the victim. The only thing that trial counsel says in his closing argument that is specific to Mr. Pye, the only time he mentions him is he tries to rebut the prosecutor's future dangerousness argument by saying, no, he won't be violent in prison. His violence in his life was all confined to his relationship with this specific victim. And he didn't know at the time, A, that he has evidence from the mouths of corrections officers that would prove that true. He's not violent in a corrections setting. But he also has neglected evidence that every single familiar relationship Mr. Pye has ever observed or ever been in was marked with violence from the time he was born, practically. His parents and his siblings engaged in almost daily attacks on each other. And so it really would have helped not to excuse in any way, but to contextualize some of what the jury's hearing and to support trial counsel's only argument for mercy. I have a question about the legal standard and then a record question that's implicated by it, okay? We're not here to review the panel decision. You've been vouching for the panel decision, though, this morning. And there's something, though, that the panel did that has appeared as well in the briefs. And that is, there's been quotations of a standard of review that at least, it appears to me, is no longer the law. So the panel opinion relied on Rose versus McNeil for a standard about state court findings lacking even fair support. And the record, that is a pre-AEDPA case. It cites Turner, which is also a pre-AEDPA case. And Marshall versus Lawnberger, the Supreme Court decision from 1983, obviously a pre-AEDPA case. And that standard, fair support in the record, was taken from the previous version of the statute, particularly 2254 D-8. It no longer appears in the statute at all. And now the burden is to prove that by clearing convincing evidence that the presumption of correctness has been rebutted. Do you agree that the fair support in the record standard, in fact, does not apply anymore? The standard is what it's always been, which is D-2. And then with the complement of E-1, if you're going to show that one of the state court's fact findings was unreasonable under D-2, then it has to be rebutted by clearing convincing evidence under E-1. Each of the state courts— —are part of the statute, no longer part of the standard, right? I would have to look into that specific question, but I honestly don't believe it matters here because all of the state court's fact findings— It may matter. We've got to make sure that we've got to state the law correctly before we apply it. Of course. You're not aware of that fair support in the record language appearing anywhere in the current statute, are you? In the statute, no, sir. Right. And then to me, that then brings us to the question about how to read these affidavits. You know, when I read the affidavits, I read them the same way the state court did. And I think I read them in context. So if you start with the affidavit of Curtis Pye, he says he did not testify, right, at trial? Correct. No one talked to me about any of this before Willie James' trial. Johnny Mosteller and his assistant Dewey know me. Mr. Mosteller represented me before. He didn't get in touch with me or ask me any questions about the house Willie James was raised in or what he was like as a child. I don't know what the point of saying he represented me before would be unless his assertion is that he didn't talk at all to the lawyer. And we have similar statements in these other affidavits. Right. And then Curtis shows up on Mr. Mosteller's time sheets a few months into his representation when they go out to talk to the family about the calibi. I take your point. Could a reasonable jurist look at these affidavits of Curtis, Ricky, and Lala and say, I think they're either misremembering or minimizing their contact with trial counsel? Sure, but... I mean, these are affidavits 10 years after the fact. And couldn't the state court say, this is just rebutted by the time records. In fact, he did speak with these individuals. And he's reading them in context. That seems to me a very fair reading. But what the state court can't do, Ben, is parlay that into a reason to disbelieve everything else in the affidavit. Reasonable jurors don't treat witness testimony as an all or nothing proposition. We discredit witness testimony all the time. For example, in the immigration context, we'll have an Edgar First credibility finding because of a few key misstatements. And fact finders are entitled to disbelieve that testimony. Right, the testimony about the contact with trial counsel. About everything they say. The most chilling, the most graphic, the key testimony about what the Pai children went through, what their home was like, what his life was like, what his background was like, come from disinterested witnesses. Curtis Lawlett and Ricky don't even have the primary testimony about what was going on in the house because they were too close to it. They don't see it for what it is. The social worker describes in graphic detail. You could set aside every single family member affidavit that is submitted in this case and still be required to find Strickland prejudice. Because the state court only found, I think, five of them not credible, right? But weren't there something like 27 affidavits total? Well, there's 27 total. 24 of them go to mitigation in some form or fashion. The state court finds the problems that we were just discussing with Curtis, Ricky, and Lawlett. It says that Mr. Lawson made this single correction to his affidavit about not actually observing her drink. And then it kind of briefly kind of flicks at the testimony of the co-defendant, which doesn't have anything to do with. Right. Let me ask you a question about the standard that Judge Pryor asked you about. What's the difference between no fair support in the record and an unreasonable determination of fact or between no room for fair-minded disagreement and no fair support in the record? Is there any daylight between those? I don't see any. I mean, I think here where the record is so clear, there's no counter-narrative here. Even if you don't believe Curtis, Ricky, and Lawlett, even if you believe their memory is flawed or they're trying to help their loved one, there's nobody standing up and saying that this didn't happen in Mr. Pye's background. Nobody's avowing it. The evidence in the record clearly and convincingly rebuts all of the state court's findings and establishes the mitigation. I see my time's through. Well, Judge Jordan has a question. Thank you, Chief. Let's assume that you are right about the district court's errors. I mean, excuse me, the state court's errors and that you get de novo review on federal habeas. Could you tell me why, given the facts and circumstances of this crime, you succeed on prejudice? That, for me, is the crucial question. This jury knew nothing. They were told that they had to execute Mr. Pye. No, I know. I'm taking it as a given that they weren't given this mitigating evidence. I'm asking you to juxtapose that with the circumstances of this crime. You know, we see, unfortunately, we see a lot of murder cases and when we talk to each other, we distinguish them in terms of degree. And we're like, we're not trying to minimize this, but this was not a heinous murder. Think of a case where someone goes in to rob a convenience store without a gun. The clerk pulls out a gun. There's a fight. The gun goes off and the clerk is killed. That's a different sort of murder than what happened here. Yes. So tell me why you think the prejudice standard is met, even if you had de novo review. Well, every Supreme Court case, plus the decisions of this court, say that even incredibly aggravated cases allow for strickland prejudice when there's powerful mitigation evidence on the table that the jury knew nothing about. Mr. Pai is brain damaged. Nobody's disputing that he's brain damaged. Dr. King is disputing whether it's localized in his frontal lobes and how much he's brain damaged. He's not disputing that he's brain damaged. Jury didn't hear anything about brain damage. The jury didn't hear about, and every single thing that we know leads to a negative outcome for an individual was present in severe form here. This evidence is exactly like that in Rompia. And to your point, Judge Jordan, cases like Cooper from this court, where Judge Carnes is saying, that's a pre-planned, premeditated home invasion, triple murder, where one of the victims is killed in front of his eight-year-old son, and prejudice is still established by mitigation evidence that is not as strong as what's here. And the jury actually had some glimpses. This jury had nothing. Any other questions? Can I ask a quick question? What do we do with the fact that Pye testified in his own defense, so the jurors actually got to see him, and then they went and convicted him and sentenced him to death? Should that matter at all in response to Judge Jordan's point? That they disbelieved his denial? You just talked about brain damage and family background and whatnot, and this is not a situation where the defendant sat silently at a table. It's a situation where he testified to the jurors. Should that matter at all? I think that it has in this court's prior precedents. I mean, certainly telling the story, trying to humanize this man, explaining his brain damage, explaining what he's been through can only help. You know, if they already disbelieve him, if they're already incredulous, telling the story of how he got here can only help. And the clearly established federal law is that it does. Okay, any other question? I'm sorry, did you? Okay, Ms. Fenton, you've saved five minutes for rebuttal. Ms. Graham. Good morning. May it please the Court. My name is Sabrina Graham. I'm here on behalf of the Warden. I ask that this Court affirm the District Court's denial of habeas relief. To begin with, I think this case comes down first, at least when I start to analyze it, is what authority does the State Court have in assessing the credibility of the evidence? You repeated the Rose v. McNeil formulation, too. That's not the law anymore, is it? I would agree with you, actually, Judge Pryor. For years now, I've been a little confused because I knew it was ADPA, but the Court kept using that, and it was used in the penal opinion, so I thought the Court had adopted it. But I have no problem. We vacated the penal opinion. That's why you're here. But in other cases, I'd seen this Court use it when assessing factual determination, but I agree that I don't think that is the law now. It is certainly not in the statute. Going back to the credibility of the State Court's decision, I think whenever you're looking at Strickland here and we're looking at prejudice, it's a balancing. That's what the State Court is looking at. You're going to balance the aggravating and the mitigating evidence. So starting off with the evidence regarding abuse and deprivation. First of all, the jury did know that he was poor. They knew that he was impoverished. That was testified to by his sister. It was also some information given in the guilt phase regarding the fact that their house didn't have running water or electricity. So the jury knew that. So the question then becomes what was appropriate for the State Court to look at in the affidavits regarding abuse and neglect? Here you have affidavits from family and friend members who actually lived in the area where we have all of our hearings. They live in Jackson and Henry County and all of that area. And despite the fact that Pye's prison records show that his family members come to visit him there, they did not show up and testify for him there. Let me ask you about that, because I read that in your brief and I sort of asked that of your advocate on the other side. And she suggested that they didn't have to, that under Georgia's sort of affidavit formula, that the affidavits were just as good as live testimony and that your argument about that is really inconsistent with the way Georgia does these hearings. Well, the fact that Georgia allows affidavit testimony does not mean that they cannot subpoena their witnesses for the State Court to look at them and assess their credibility. That has, yes, you can put in affidavits, but that doesn't keep them from bringing those particular people there. And again, it goes back to- But you can't have a system, it doesn't go to your ultimate point, but you can't have a system where affidavits are permitted and yet a court is discrediting affidavits because they're affidavits. You can't do that. You can say in this particular case, on this particular person, for this particular reason, but if the system as a whole says, you can submit affidavit testimony, you've got to give notice to the other side, they can depose the person, et cetera, et cetera, and then you can present the affidavit, you can't discount the affidavit flat out just because it's in paper form, right? Oh, I agree with you on that, Judge Jordan. Did that happen here? No, that did not happen here. What happened here was the State Court said, I'm viewing these with caution because it noticed some artful drafting and some inconsistencies in the record. But also wasn't there in the record evidence that disputed what was contained in those affidavits, i.e. the time records for the counsel for Pye? Correct. There were disputes in the time records. There's also disputes in the trial testimony from some of the affidavits in the testimony that they gave in their affidavits. This is about holistically looking at the affidavits, whether or not the court, the court did not say, I'm not looking at these affidavits at all. The court merely said, I'm looking at them with caution to the extent that they're exclusively relied upon. It looked at the affidavits, compared it to the record, and said, you know, I don't believe this, right? I don't think you could say that the court necessarily said, I don't believe this. He says, I'm viewing it with caution and I do not think that this particular evidence outweighs the aggravating evidence in this crime. Again, it's a back to the weight. Here's my concern about the affidavits overall, is we've got, in Waters v. Thomas, we have this statement that you've sort of been alluding to and has been cited where we say you might want to view affidavits with caution. It seems like that's inconsistent with Georgia's process of allowing these affidavits to come in in every case, if not challenged. It seems like there's some inconsistency there. Actually, there's not. When you look at Georgia Supreme Court precedent, when they have granted a CPC application or the state is lost and they've looked at these affidavits, I think they also look at them too with caution. You can see that they'll say in there, these are only as credible as the information. For example, if a mental health expert relies upon affidavits to construct a social history, the state, Georgia Supreme Court has said these are only as, that social history is only as reliable as the affidavits with the information they are given. So the court does look at the credibility and certainly, I'm sorry. You said the court just looked at them with caution, but as I read the affidavits, the affidavits, at least a few of the affidavits, defense counsel didn't contact me. And the court looked at other evidence in the record that showed that it was inconsistent, flatly inconsistent with that, right? Yes. And for that reason, discredited the affidavits. Isn't that what the state court did? Am I misunderstanding? I don't understand how it's just looking at it with caution versus... I took it as the state court looked at the particular affidavits and said, you know, I see some discrepancies here with the affidavits and the record evidence before me. Therefore, inciting to this court's precedent, I'm going to look at this stuff with caution. And I don't, I did not take it as the court had completely discredited all the affidavits. You can't believe both, can you? I think you can. I think that you can take, you can look at somebody's, when somebody testifies at trial, I think you can look at them and say, you know, there are certain things that you may believe that they said, and there may be certain things you don't believe that they stated. But here, I think what the state court... It's not a matter of whether the witness believes the witness is telling the truth. If the witness says, the lawyers didn't contact me... That's correct. ...but there's record evidence that the lawyers did contact the witness, how can you believe both? That's not what I meant. I'm sorry. Maybe I'm being... Well, for one thing, because the Curtis affidavit says, no one contacted me about these matters right after a paragraph where he discusses the childhood environment, the home, and the state court uses an ellipsis for about these matters to make it say that the defense team never contacted me. That's true, isn't it? Correct. But again, the implication there is that he was never contacted and talked to about anything by Mosteller when the trial records show the opposite. Doesn't the state court have to read the affidavits in the context of the entire record, going back to Judge Ligoa's question? I absolutely agree. And here, when you look at this entire record, the evidence of abuse and neglect is only contained in the affidavits. There are absolutely no state court... I mean, no government records, nothing from Department of Family and Children Services. None of the other records show that there was any abuse and neglect in this family. You also have the fact that... Well, let me ask you a slightly different question. Judge Ligoa referred to the billing records, and that's the basis for discrediting these affidavits, right? That the witnesses supposedly said, no one met with me, and the billing records say that there were some meetings, right? Is there any other evidence? You have Mr. Yarber, who was Mosteller's investigator. He testified that they went and they met with the family. The family was not helpful. He stated that they would have asked about abuse and neglect, and he did not recall the family telling them about abuse. Okay, because as I recall the interactions with the family, it looked from Mr. Yarber's testimony like that was about the guilt phase of pursuing these avenues of saying that Mr. Pye was not guilty. I would disagree. I think in his deposition testimony, Mr. Yarber, he does kind of qualify the... I guess their meetings regarding the guilt phase, but when you look at his live testimony before the state habeas court, there is no qualification there. He says, we went and asked them, and they were not helpful about the defense. He didn't say guilt in a sense or sentencing. Let me go back to Judge Pryor's question about whether there were credibility determinations on all these affidavits. As I read the state habeas court's decision, it sounds like the state court dismissed the affidavit. It pointed out some inconsistencies, as you said, but what the state habeas court said, well, Waters says that affidavits after the fact are artfully drafted, and therefore, I'm not going to believe them, or I'm not going to consider them. Isn't that? No, I don't think they say you're not going to... I'm sorry. Isn't that what the state court did? It's a little unclear. No, I don't think it says that you're not going to consider them. It says that they don't have a lot of significance. So again, when you're talking about Strickland, you're talking about weighing. So they don't have much... But going back to what Judge Bransher asked, how can that be? I mean, how can affidavits be acceptable? And then at the same time, the state habeas court says, well, because they're affidavits and they're long after the fact, they don't help. Well, simply because testimony is admissible doesn't mean that it has credibility. I mean, that's... Which gets to my point. Did the state court credit it or discredit it? It seems to me clearly it discredited it. He did discredit some of them, yes. So let me just make sure I've got my head around this. So there are three affidavits, right? Curtis, Rickey, Lalame, with respect to whom there are specific inconsistencies that the state court identified. And so to Chief Judge Pryor's question, he discredits those. With respect to the balance of the affidavits, there aren't these specific inconsistencies, but the state court says, you know, citing waters, we view these with caution. And actually, with respect to some of them, I see evidence of this artful drafting that sort of led us to say what we said in waters. And so you've got sort of discredit with respect to three and then view with caution with respect to all. Is that right? That's how I take it, yes. Also, there are three other affidavits in there that the state habeas court identified issues with in the record. They had to do with other issues in the case, but the affidavit from Chester Adams, who was the co-defendant who basically says he didn't have anything to do with it, was completely different than his videotaped confession. And also there were two other witnesses who had given statements to the law enforcement that provided affidavits that were inconsistent with their statements to law enforcement. And when you say go to other issues, you mean guilt phase as opposed to penalty phase? Yes, but I think that a couple of the affidavits do go to the sentencing phase in their argument because they're talking about the victim's cocaine addiction. You said something that puzzled me on page 50 of your brief. You say there's no clearly established federal law that requires a state court to specifically mention evidence or view evidence in a particular manner. I mean, I thought it was settled law that state courts don't have to provide a detailed explanation of how they view mitigating evidence. I agree. I agree with you, Judge Pryor, that it is settled law. They don't have to say it. I think I was just trying to hit you. Inartfully drafted. I'm sorry, Judge Jordan. That's okay. So again, going back to abuse and neglect here. So what the state court had to do, the court had to weigh this information. The court's looking at affidavits, and he doesn't have anything else, particularly any other records in here that corroborate that abuse and neglect. And when you look at Williams, Wiggins, and Rompilla, you do have state court records that documented their abuse and neglect. And their abuse and neglect was much worse than what is attested to in the affidavits here in this case. So I think those cases are distinguishable just on that basis, the fact that there is something else there for the court to look at other than just affidavits. The penalty phase of the trial began the day after the guilt phase ended. And so there isn't anything in the record that would dispute that Mosteller had, what, half a day to prepare for the penalty phase? There's nothing that conflicts with that in the record. Well, I think that his billing records conflict with that, and Mr. Yarbrough's testimony would conflict with that, because they show them going to visit the family right after he's appointed as counsel. And he also talks to, he visits Pye many times and talks to him. That means that you're saying he was preparing for the penalty phase and guilt phase before a trial? Yes, yes. I don't think there's any question. I mean, they're presumed, he's presumed to have been effective, and we do have that he went and talked to them. He was deceased at the time of the evidentiary hearing, though, right? Correct. So we don't really know the answer to that question. But according to Dunn versus Reeves, where you don't have the testimony, you still assume that they are, you know, representing them competently. But didn't you have the testimony of the investigator who had worked with him for a long period of time in these kinds of cases, and he testified as to what their usual practice was? Yes, he did. In these kinds of, in capital cases. He did. And he said that they would normally ask about abuse. And the other question I had was with regard to Mr. Mosdiller's prior representation of the victim in this case. Do we know that the court, the state court, determined that there was no conflict of interest? The state habeas court determined that. Do we know the circumstances surrounding that representation from the record in this case? It was actually, he was representing Mr. Pye and Ms. Yarbrough at the same time they were both arrested for drug charges, which actually was only helpful to Mr. Mosdiller because he tried to get in at trial that the victim had cocaine in her system and was a known drug addict in that particular area. So there was nothing there that showed that it affected his representation in any way that he had represented her before. He vigorously argued to get that information in, and the trial judge would not allow it. Going back to the, I want to go back and mention the nexus that you guys were talking about. Before you get to that, let me ask you a question about Reeves, because you mentioned that case. I struggle with how to read Reeves as consistent with Wilson, because Wilson said you have to look to the actual reasons that the state habeas court gave if there's a reasoned decision, and there was one here. Similarly, in Reeves, there was a reasoned decision, and the court seemed to apply Richter-style review in that case where it said if counsel had any possible reason for proceeding as they did, as opposed to what the state court found. But in Reeves, there was absolutely no evidence about defense counsel strategy, whereas here, you have affidavits, and you have billing records, and you have the testimony of Yarborough. So doesn't that make this case different from Reeves? I don't think that the standard that you, the presumption of effectiveness that you give to counsel makes it any different. I agree that the record there would be different, but I'm not familiar with what the record was in Dunn versus Reeves. I read the state court opinion and said, you know, we don't have anything here from trial counsel, and they could have testified. I don't know if they had their billing records or anything like that. My point is simply that you assume that counsel is presumed to be effective, and where you don't have counsel testifying about what his strategy was, you have to assume that that is strategic. Before you finish up, would you address the issue that Judge Jordan raised with the opposing counsel about the heinousness of the crime and weighing, re-weighing the mitigating versus aggravating factors? Sure. If you were to look at this under DeNovo, I still think that the warden should prevail because when you look at it again, it's a balancing act. So the first bit of evidence that you have here is poverty, abuse, and neglect. The jury knew about the poverty. They did not know about the abuse and neglect. So, you know, you start off that they didn't know that information. When you talk about the mental health information, you have, essentially, it's like an offset. I mean, you have their mental health experts saying one thing, and you have the state's mental health experts saying another thing, and you have the state court crediting the mental health expert. And I understand that they want to say he has brain damage, and that could contribute to his crime and things of that nature. But our mental health expert, the brain damage we're talking about here are learning disabilities. We're not talking about the inability to plan, the inability to lead, the inability to have committed this crime in any way. And this was a crime that took place over an extended period of time. So it's, you know, whatever his learning disabilities, I don't see how that shows that that is particularly mitigating for this particular crime. Then looking at the future... What about the evidence of domestic violence, which is the nature of the act that he eventually committed? I believe that the domestic violence that he committed has to do with between his relationship. Maybe he did see that between his parents. Well, let me, okay, I think you're getting to the answer to my question. So, I mean, I'm not saying he didn't see domestic violence, you know, between his parents. But again, he's almost 30 years old when he commits this crime. That is an appropriate factor to look at here. His, you know, whatever relationship they have, maybe it's mitigating, but does it mitigate the rape? This is not a crime only where it was a crime of violence in terms that he hit her repeatedly. He also raped her multiple times. And I think when you look at the crime as a whole, when you have, they kidnap her, they rape her, gang rape her twice, and then they take her out to a dirt road and they shoot her. And that is very, I mean, that is an extremely aggravated crime. And on the other side you have, okay, he grew up poor, mom and dad, maybe they were abusive and alcoholic. But you also have here mental health evidence that shows that he's not intellectually disabled and that he has a personality disorder with antisocial traits. And that he had no problem planning this information. Regarding the future dangerousness argument, you have, oh, the guard's saying, well, he was a great model inmate. But then you also have his prison records showing that he was not. He was insubordinate. They did have to wrestle him to the ground. He did fight with another inmate. So when you're looking at the balancing there, I mean- Wasn't he found not guilty of that? I'm sorry, I'm sorry. Wasn't he found not guilty of fighting of the violence with the other inmates? There was one where he was found not guilty. And then there was one where he was not. That he was found guilty. That's how I read the records. I mean, there was a lot in there. Well, I'll have to double check. My recollection is there were two where he was found not guilty. Sure. And so I think when you balance it out, you don't have here a documented history of abuse and neglect like you do in all the other cases. The mental health evidence doesn't necessarily really speak to much mitigating of the crime. The future dangerousness has another side to it as well. So when you're looking at Strickland, you're presuming here- I don't see how you could say that all of that information necessarily outweighs the aggravating evidence of this crime considering all the actions that he took. Obtaining the gun, I mean, and the mask and everything of that nature. So unless the court has any further questions. Thank you. Thank you, Ms. Graham. Ms. Benton, you've saved five minutes. Thank you. I want to correct something really quickly about brain damage before moving on to affidavits. The brain damage evidence here is not learning disabilities. Look at the cross-examination of Dr. Kang at D1444 starting around page 79-80 and look at the remainder of his cross. He's not talking about just learning disabilities and that is a far cry from what the jury heard, which was that he was normal. Moving on to affidavits, I'd like to make a brief factual point and then a legal point that's crucial here. First, if all the affidavits are artfully drafted, why would Curtis and Rickey and Lawless be inconsistent with the time records in any way? If these were somehow engineered, there would not be... The reason that Curtis and Rickey and Lawless affidavits are the way they are is because they're based on the witness's memory. And as to the rest of the affidavits, the state attorney general drafted this order and they had those affidavits for three years. Don't you believe that there was anything to be criticized in any of those remaining two dozen affidavits that that would appear in this order? The best that they could say was that they were artfully drafted and cite to Waters. Which brings me to the Waters point. The Waters artfully drafted language was about a very specific affidavit in Waters' specific case where there was sort of a flourish of language. And it's since been sort of expanded to talk about affidavits in general when in fact the law is that affidavits from family members can be used to establish prejudice. Cooper, Johnson, the mitigation evidence in the Johnson case, Johnson v. Secretary in 2011, almost entirely from family member affidavits. The same thing in Farrell, Farrell v. Hall, it's all from family member affidavits. And Ms. Graham said that in Williams v. Taylor, there were other records corroborating the mitigation. The specific quote from Williams v. Taylor is that the mitigation evidence came, quote, mostly from relatives. And then it follows up with the fact that there is testimony from corrections officers about his prison nonviolence. So I think that the law is very clear that this kind of affidavit evidence works to establish prejudice. I want to quickly address Judge Rosenbaum's question about the prison fights with the other events. There are only two, one he's found not guilty, the other is horseplay. That kind of gets a little bit out of hand. There are no other fights. As to whether or not Mr. Pye's family was uncooperative, as Mr. Yarbrough testifies, Mr. Yarbrough testifies when he's asked by State Habeas Council, how many siblings does Mr. Pye have? He says, I believe three, two brothers and one sister. And State Habeas Council says, so that's who you met? And he says, yes. This is on D-1441 at page 74. And so the universe of family members that Mr. Yarbrough can potentially be talking about as uncooperative is five, the two parents, two brothers, and one sister. We know that the sister is cooperative because it's documented in a contemporaneous memo from Mr. Yarbrough, and all the witnesses agree that Mr. Pye's sister, Pam, was cooperative and helpful and recruited all the mitigation witnesses. So she can't be deemed uncooperative. So we're talking again, a maximum of two brothers and the parents. And again, the crucial mitigating testimony doesn't come from them. It comes from disinterested members of this community who swore under oath that this is what this family was like and this is what these children went through. Anything else, Ms. Benton? No, I'm happy to address Judge Wilson's question about the prior representation, if that's still an issue. He represented, Mr. Mouser represented both Ms. Yarbrough and Mr. Pye on a drug charge where the question was, whose drugs are these? It's a classic conflict of interest. And he does not get the drug addiction evidence that he knows is salient out after it's been made relevant. The Georgia Supreme Court on direct appeal says, no, you weren't prohibited from putting in this drug addiction evidence about the victim. You just were told you had to wait until Mr. Pye's testimony made it relevant. And once that event happened, Mr. Mosler made no subsequent attempt to come back and get any evidence. The evidence from Charles Puckett that said he initially thought that Ms. Yarbrough was the one who had broken into the house and taken the belongings. The evidence from all of the people who knew about her addiction and all of that evidence that he was trying to get in because he said it exculpated Mr. Pye for rape, he didn't turn around and put it in. And maybe I'm wrong or I misread the record, but I thought the evidence was that the door was kicked into where she was at. Where she was kidnapped. If you look at States Exhibit 17 at trial, which I think is D1312 at maybe page 20. If you look at the color photograph, the damage to the door has been repaired with duct tape. And then there is a unbroken lock, a lock that's intact and hanging in the unlocked position. And there's no footprint on the door. So there's certainly damage to the door. The kicked in language comes in later from the police as the case sort of progresses. So, and again, it's a residual doubt question. Thank you, Ms. Bitten. Thank you.